In the Matter of SIDNEY A. WEISBERG, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, August 10, 1989

**APPEARANCES OF COUNSEL**

*Richard M. Maltz* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

*Eileen Courtney* for respondent.

## OPINION OF THE COURT

Per Curiam.

Respondent Sidney A. Weisberg was admitted to the practice of law by the First Department on September 13, 1965, and at all times relevant herein, he maintained an office for the practice of law in the First Judicial Department. Respondent was indicted in the Superior Court of New Jersey, Bergen County, and on January 17, 1984, pleaded guilty to the charge of unlawful placement of a child for adoption, a misdemeanor under New Jersey law. He was sentenced to pay a $2,500 fine and to serve two years of probation.

Petitioner commenced disciplinary proceedings against respondent in July 1987, charging that he had: handled a legal matter without adequate preparation, in violation of DR 6-101 (A) (2) of the Code of Professional Responsibility; misrepresented a material fact to his client; been convicted in New Jersey of a crime; failed to deposit client funds in an escrow account, in violation of DR 9-102 (A); and failed to deliver the client's funds in his possession upon request, in violation of DR 9-102 (B) (4). The Hearing Panel found that four of the charges had been sustained, but rejected the second charge of misrepresentation. A majority of the panel recommended that respondent be publicly censured, however, one member dissented, deeming the recommended sanction insufficient, and recommended that at least a one-year suspension be imposed. Upon review of the record, we agree with the dissenting recommendation as to the seriousness of the charge and the sanction to be imposed.

In April of 1981, respondent was retained by a couple who wished to adopt a child. Respondent informed them that he had learned through a former client, Lee Gilbert, that a pregnant woman in New Jersey wished to give up her child for adoption. Gilbert told respondent that the woman was divorced and that her former husband, who was black, was not the father of the child. Gilbert also represented that the mother and putative father were both white and well educated. This information was conveyed by respondent to the couple seeking the adoption. They agreed to go forward with the adoption for a cost of between $12,000 and $20,000 for expenses, including hospital fees, pre- and postnatal medical care for the mother and child, fees for counsel in the New

Jersey Surrogate's Court proceeding, and respondent's legal fees at the rate of $100 per hour. Respondent was given a check for $10,000, which he placed in an escrow account.

In late July 1981, Gilbert informed respondent that, contrary to his prior statement, the mother was not divorced but only separated from her husband, and that she was not highly educated. Respondent informed the prospective adoptive parents, who were still willing to proceed with the adoption, reasoning that if the child were white, the husband could not be its father. If the child were of mixed race, they were not interested in the adoption. Shortly thereafter, on August 6, 1981, Gilbert told respondent that an additional $8,000 in cash was required, $5,000 of which was for the mother and $3,000 for Gilbert for his services rendered. Although respondent saw no difficulty in paying Gilbert, he stated that it would be illegal to pay the mother and he could not agree to it. Gilbert then stated that that $5,000 was for the mother's postpartum psychiatric care. The intended adoptive parents, although troubled by the request, agreed to pay it for fear that otherwise they would not get the child.

The mother gave birth to a healthy, white male child on August 21, 1981. However, the husband appeared at the hospital to contest the adoption, and Gilbert informed respondent that the matter might have to be litigated. Two days later, respondent and his wife and the prospective adoptive parents went to New Jersey to receive the child. The couple gave respondent and his wife a basket containing baby clothes and an envelope with the $8,000 in cash, which respondent's wife put in her pocketbook. The parties traveled to New Jersey in separate cars and the couple waited in a diner while respondent and his wife went to the hospital to take custody of the baby. However, respondent was arrested at the hospital by the New Jersey authorities.

Following his arrest, respondent had no contact with the prospective adoptive parents until the spring of 1982, when they instituted a civil action to recover both the $8,000 cash which respondent had retained and the $10,000 which had been placed in escrow. The civil action was settled at the end of November 1982 and the respondent immediately returned the remaining $6,000 in the escrow account, and the balance of $4,000 was paid over the next seven months. However, the $8,000 was used by respondent to pay his New Jersey criminal attorney in November 1983. Respondent's attorney notified petitioner of his conviction in New Jersey on the misdemeanor

charge of unlawful placement of a child for adoption. At his interview before the Disciplinary Committee, respondent agreed to return the $8,000 to the couple, and did so as of July 13, 1988.

In his cross motion, respondent challenges petitioner's finding sustaining the charges that he failed to deposit a client's funds into an escrow account and that he converted said funds to his own use. Respondent contends that after his arrest he could not return the money to the couple without criminally inculpating himself. Moreover, he maintains, the parties did not intend for this money to be placed in an escrow account because on the day that he received it it was to have been paid to the mother. Respondent also argues that he did not commit conversion because he did not intend to deprive the couple of their money. These arguments, however, are unavailing. The mandate of DR 9-102 (A) is clear and does not require an agreement between counsel and client to become operative. Although, originally, the $8,000 was intended to further the adoption, once it was clear that the adoption would not go forward, the funds should have been placed in an identifiable bank account. Whether or not respondent intended to deprive the couple of their property is also irrelevant, inasmuch as the tort of conversion requires no proof of intent. (See, Matter of Morrison, 137 AD2d 70, 73 [1st Dept 1988]; Matter of Engram, 129 AD2d 115 [1st Dept 1987].) It is sufficient to establish a violation of DR 9-102 (B) that respondent failed to promptly pay his clients' funds, which they were entitled to receive, to them on demand.

While we agree with petitioner's findings of fact, we cannot agree with the majority's assessment of the seriousness of the charge. The dissenting panel member was correct in her assertion that the placement of children for adoption requires "open procedures, and not covert operations, such as the delivery of cash in the middle of the night in an unmarked envelope." Respondent, as an attorney, is charged with a duty to protect the public interest and maintain public confidence in the practice of law, obligations which are antithetical to his conduct in this case, which can only be characterized as an attempt to purchase an infant. We therefore consider the sanction of one year's suspension from the practice of law to be warranted.

Petitioner's motion should be granted, the petition confirmed, and respondent suspended from the practice of law herewith for a period of one year.

MURPHY, P. J., ROSS, KASSAL, ROSENBERGER and ELLERIN, JJ., concur.

Petition granted, cross motion denied, and respondent is suspended from practice for a period of one year, effective September 10, 1989, and until the further order of this court.