In the Matter of NICHOLAS PAUL ALTOMERIANOS, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, August 2, 1990

## APPEARANCES OF COUNSEL

*Alan S. Phillips* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

*Eileen Courtney* for respondent.

## OPINION OF THE COURT

Per Curiam.

Respondent was admitted to the practice of law in New York by the First Judicial Department on March 27, 1967, and at all relevant times has maintained an office for the practice of law in the First Judicial Department.

Respondent is an immigration lawyer who had virtually no experience in commercial transactions when he reluctantly agreed in March 1983 to represent a friend selling a restaurant. Under the contract that respondent prepared by "filling in the blanks" of preprinted forms, $10,000 of the $90,000 purchase price was to be held by him in escrow to secure payment of any sales tax that might be assessed against the restaurant for a period of time it was still owned by his client, the seller. At the closing, however, the buyer insisted that $15,000 more be placed in escrow, and so a second escrow agreement was then hastily handwritten by the buyer's attorney, which was an exact copy of the typewritten escrow agreement respondent had prepared prior to the closing except that it provided for an "additional" $15,000 to be held by respondent in escrow for payment of any sales tax that might be assessed. Respondent testified that he did not read this second escrow agreement, and signed it thinking that the $15,000 was meant to secure payment of any and all liabilities, not just sales tax, incurred by his client in operating the restaurant. Respondent attributes this mistaken belief to the fact that during the one-week period after the contract was signed and before it was closed, the buyer took possession of the restaurant and learned of, and immediately brought to respondent's attention, bills the seller had not paid refuting the "affidavit of no creditors" the seller had given when he signed the contract. During this one-week trial period, the problems that developed had nothing to do with sales tax, and only to do with respondent's client's unpaid bills to suppliers, utilities and the like, and so, because respondent did not read the second escrow agreement, and because nothing was said verbally at the closing concerning its purpose, respondent left the closing with $15,000 believing that only $10,000 of the sum was earmarked for sales tax, when, by the plain terms of the escrow agreements he had just signed, all of it was so earmarked.

Respondent deposited the $25,000 into his general business account. He had never entered into an escrow arrangement of any type before; did not have an attorney's special account; and was unaware of the requirement that he maintain one. Immediately after the closing, the buyer advised respondent of yet more unpaid bills. Believing that he was holding $15,000 just for this purpose, respondent, by early June 1983, had disbursed approximately $5,000 on account of these bills, writing one check to one of his client's suppliers for approximately $3,500 and several checks aggregating approximately $1,500 to the buyer of the restaurant himself to pay some other bills. While the buyer clearly acquiesced, and indeed insisted, on these payments, the record is at best inconclusive as to whether the buyer understood that respondent understood these payments to be a proper charge against the escrow fund. In addition, in late June 1983, respondent gave his client a check for $5,000 on the understanding that the client would use such to pay sales tax. The client, however, used this money for purposes other than payment of sales tax, and then disappeared.

Meanwhile, during the three-month period between the closing and the payment to his client of this $5,000, respondent was withdrawing money from the account for his own use, with the balance in early April falling below $2,000 and rising in mid-June to $11,000; thereafter, as found by the Hearing Panel, the balance "remained below the escrow amount during the escrow period, except for several occasions." Questioned about this, respondent stated that it simply did not "dawn" on him that he was supposed to keep the escrow money in a separate account, and that, while he did understand that he was personally responsible for the $25,000 entrusted to him as escrow agent, all he had to do, when the time came for making a payment out of the escrow fund, was replenish the commingled account with his own "personal monies".

Frantic efforts by respondent to locate his client were unsuccessful when, in November 1983, the client's sales tax liability was first assessed at $17,000, and later at $26,000, and the buyer, who was being threatened with foreclosure by the tax authorities unless this assessment was paid, demanded that respondent pay the assessment at least to the extent of the $25,000 that had been given to him to hold in escrow. Respondent, however, refused to do so, as he had good reason to believe that the assessment was excessive and that a goodly

portion of it was in any event attributable to the buyer's operation of the store. As he explained to the Hearing Panel, he believed he had an obligation to his client not to pay what he thought was an incorrect assessment notwithstanding that the client was uncooperative and indeed nowhere to be found. This compelled the buyer to institute a lawsuit against respondent, which, in July 1985, resulted in a judgment directing him to pay to the tax authorities the sum of $15,000. Even then, however, respondent apparently felt himself obligated only to the extent of $15,000, representing $25,000 less the $10,000 he had paid to his client and to or on account of his client's creditors, which amount he deposited into a special account he finally set up in September 1985. Respondent testified that in October 1985, he turned over to the tax authorities, after extensive discussions and with their consent, the sum of $15,006, and has not heard from them since. Neither has the buyer. When asked by the Hearing Panel what he would do were the tax authorities to demand that he pay them the $10,000 he still owes under the judgment, respondent testified that he would somehow find the money; meanwhile, he would have us "assume" that the sales tax matter has been resolved. The buyer's perspective is somewhat different. As his attorney put it before the Hearing Panel, "No news is goods news."

The Departmental Disciplinary Committee (DDC) charged respondent with violating: (1) 22 NYCRR 603.15 (a) ("An attorney in possession of any funds or other property belonging to another person, where such possession is incident to his or her practice of law, is a fiduciary, and must not commingle such property with his or her own") and Code of Professional Responsibility DR 1-102 (A) (5) (A lawyer shall not "[e]ngage in conduct that is prejudicial to the administration of justice"), in that he failed to maintain an attorney's special bank account; (2) DR 9-102 (A) ("All funds of clients paid to a lawyer * * * shall be deposited in one or more identifiable bank accounts"), in that he commingled the $25,000 given to him as escrow agent with his own funds; and (3) DR 1-102 (A) (4) (A lawyer shall not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation"), in that he "misappropriated and/or converted approximately $10,000 of said escrow funds". The Hearing Panel sustained each of these charges, while finding that respondent, with respect to the $5,000 he disbursed for the purpose of paying his client's general creditors, "had no intent to do harm to anyone" and

"sincerely believed that the escrow funds he expended would be used for the benefit of the purchaser", and, with respect to the $5,000 he disbursed to his client, had "acted in an innocent but foolish manner out of concern for a friend" and "relied upon the good faith of his client-friend in circumstances where he should not have done so." The Hearing Panel also found that during the period of the escrow agreement, respondent "wrote checks and withdrew money from his business account for his own benefit", and "thereby took some of the escrow money for his own benefit even though his motivation and intention was not to appropriate escrow funds for his own benefit." As for discipline, the Hearing Panel recommended a four-year suspension, rather than disbarment, the "usual" penalty for "conversion of escrow funds", in view of respondent's previously unblemished record, contrition, excellent character references, and community service.

The DDC moved to confirm the Hearing Panel's findings of fact and conclusions of law, but took no position as to the appropriate measure of discipline. Respondent cross-moved to disaffirm the report insofar as it found him guilty of converting $10,000 of the escrow money, thereby violating DR 1-102 (A) (4), and to confirm the report insofar as it found him guilty of commingling the $25,000 and failing to maintain a special account, thereby violating, respectively, DR 9-102 (A) and 22 NYCRR 603.15. As for discipline, respondent urges that a public censure would be appropriate.

Respondent argues that he should not be held guilty of having "misappropriated and/or converted" the "$10,000 since, as found by the Hearing Panel, it never was his intent to retain any of the escrow money for himself. Opposing the cross motion, the DDC argues that intent to permanently misappropriate client funds for one's own use is not a necessary element of conversion; to sustain such a charge, the DDC argues, it was quite enough for the Hearing Panel to find that respondent's commingling was coupled with a "misappropriation of part of the escrow funds for his own personal business use" (citing *Matter of Morrison,* 137 AD2d 70; *Matter of Engram,* 129 AD2d 115; *Matter of Pinello,* 100 AD2d 64, 65 ["(v)irtually all lawyers who take money from an escrow account undoubtedly intend to restore the funds"]; *Matter of Rogers,* 94 AD2d 121; *see also, Matter of Weisberg,* 149 AD2d 58, 61 [tort of conversion requires no proof of intent to deprive one of property]; *but see, Matter of Altschuler,* 139 AD2d 311, 313, 314 [Hearing Panel finding that acts of commingling and

conversion was not venal and therefore not a violation of DR 1-102 (A) (4) confirmed without comment distinguishing or overruling precedents to the contrary]).

If the DDC's argument in opposition to the cross motion is meant to suggest that respondent should be deemed to have engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation merely because he permitted the balance in the commingled account to fall below the amount he was supposed to hold in escrow while using a portion thereof for his own personal purposes, such a suggestion is not implied in its notice of charges. Within weeks after taking the escrow money, respondent permitted the balance in the commingled account to fall below $2,000. Yet, he was neither charged with nor found guilty of having converted $23,000; he was charged with and found guilty of having converted only $10,000. A fair reading of the charges implies that respondent would not have been charged with conversion, and thus with conduct involving dishonesty, fraud, deceit, or misrepresentation, had the separate account he finally set up in September 1985 been funded with $25,000 instead of only $15,000. We cannot accept such an implication. A violation of DR 1-102 (A) (4) should not depend on whether a commingling attorney in the end has the personal resources to make good the money he misappropriates; it should depend, rather, on whether the misappropriation was done with venal intent. That venal intent is a necessary element to DR 1-102 (A) (4) we think is compelled by the definition of fraud given the "Definitions" section of the Code of Professional Responsibility as "not includ[ing] conduct * * * which lacks an element of scienter, deceit, intent to mislead, or knowing failure to correct misrepresentations which can be reasonably expected to induce detrimental reliance by another."

Respondent violated DR 9-102 (A) immediately when he deposited the $25,000 in his general business account. With respect to that violation, we do not consider it a mitigating circumstance that respondent did not know that this money was supposed to be deposited in a separate account; we consider it an exacerbating circumstance that respondent permitted the balance in the commingled account to fall below $25,000; we consider it a further exacerbating circumstance that respondent used the escrow money not only for purposes he believed to be beneficial to the parties to the contract, but also, albeit without venal intent, for his own personal purposes as well; and we consider it a mitigating circumstance

that respondent restored to the escrow fund whatever he might have taken ("converted") for his own personal use. But, whatever the exacerbating and mitigating circumstances relevant to respondent's admitted violation of 22 NYCRR 603.15 (a) and DR 9-102 (A), and no matter how potentially harmful to the buyer was respondent's "innocent but foolish" conduct, and notwithstanding the authorities cited by the DDC sustaining, without discussion, a charge of conversion as a violation of DR 1-102 (A) (4) in not dissimilar circumstances, respondent's commingling should not ipso facto implicate him in a violation of DR 1-102 (A) (4) merely because the balance in the commingled account fell below the escrow amount and was not restored prior to the institution of disciplinary proceedings.

We emphasize, again, that misappropriated funds used by an attorney for personal purposes makes the "conversion" much worse than if the funds are misappropriated for reasons the attorney honestly believes to be consistent with his obligations as a fiduciary, but, even so, absent a finding of venal intent, the particular use to which the misappropriated funds are put bears mainly on the gravity of the violation of DR 9-102 (A) and not to whether there has been a violation of DR 1-102 (A) (4). The latter charge should be reserved for conduct that is fraudulent within the meaning of the "Definitions" section of the Code of Professional Responsibility and generally warrants disbarment. In short, we simply do not think that it can be fairly said of respondent that his conduct in this matter was dishonest and deceitful.

We note, but do not address, the defense raised in respondent's answer to the statement of charges that the charges do not allege misconduct showing that he engaged in conduct prejudicial to the administration of justice in violation of DR 1-102 (A) (5). We deem that defense abandoned because it is not reiterated or otherwise argued in connection with the instant motions.

Given the finding that respondent's commingling and "conversion" of the escrow money was not venal, and his previously unblemished record, contrition, excellent character references, excellent professional reputation in the field of immigration law, *pro bono* work, and community involvement, the appropriate measure of discipline is a two-year suspension (*Matter of Altschuler,* 139 AD2d 311, *supra; Matter of Morrison,* 137 AD2d 70, *supra; Matter of Engram,* 129 AD2d 115, *supra*).

Accordingly, the DDC's motion to confirm the Hearing Panel's report should be granted to the extent of confirming so much of the report as found that respondent violated 22 NYCRR 603.15 (a), Code of Professional Responsibility DR 9-102 (A), and DR 1-102 (A) (5). Respondent's cross motion to disaffirm the Hearing Panel's report should be granted to the extent of disaffirming so much of the report as found that respondent violated DR 1-102 (A) (4). Respondent should be suspended from the practice of law for a period of two years.

Ross, J. P., Asch, Kassal, Wallach and Smith, JJ., concur.

Petition granted to the extent of confirming so much of the report as found that respondent violated 22 NYCRR 603.15 (a), Code of Professional Responsibility DR 9-102 (A), and DR 1-102 (A) (5); and respondent's cross motion to disaffirm the Hearing Panel's report is granted to the extent of disaffirming so much of the report as found that respondent violated DR 1-102 (A) (4), and respondent is suspended from practice as an attorney and counselor-at-law in the State of New York for a period of two years, effective September 4, 1990, and until the further order of this court.