[618 NYS2d 899]

In the Matter of PETER R. WEISS, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, November 15, 1994

## APPEARANCES OF COUNSEL

*Karen A. Robinson* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

*Mitchell K. Friedman* of counsel *(Jerome Karp, P. C.,* attorney), for respondent.

## OPINION OF THE COURT

Per Curiam.

Respondent Peter R. Weiss, Esq. was admitted to the practice of law in the State of New York in the Second Judicial Department on October 23, 1974 and has, at all relevant times, maintained an office for the practice of law within the First Judicial Department.

On or about August 11, 1993, respondent was served with a Notice and Statement of Charges alleging that respondent: neglected a medical malpractice case for 12 years in violation of Code of Professional Responsibility DR 6-101 (A) (3) (22 NYCRR 1200.30 [a] [3]) (Charge 1); misrepresented the status of the case to the client and the Disciplinary Committee in violation of DR 1-102 (A) (4) and (5) (22 NYCRR 1200.3 [a] [4], [5]) (Charge 2); presented false documents to the client and the Disciplinary Committee to support his false claim that he reached a settlement in the medical malpractice case, in violation of DR 1-102 (A) (4) and (5) (22 NYCRR 1200.3 [a] [4], [5]) (Charge 3); allowed his escrow account to be depleted of funds belonging to another client in order to pay a fictitious settlement sum of $6,900 in the nonexistent medical malpractice case, in violation of DR 1-102 (A) (4) and DR 9-102 (A) (22 NYCRR 1200.3 [a] [4]; 1200.46 [a]) (Charge 4); commingled personal funds with clients' funds in violation of DR 9-102 (A) (22 NYCRR 1200.46 [a]) (Charge 5); and engaged in conduct which reflected adversely on his fitness to practice law in violation of DR 1-102 (A) (8) (22 NYCRR 1200.3 [a] [8]) (Charge 6). Respondent served his answer on or about September 1, 1993 in which he admitted most of the factual allegations but denied each of the charges.

Hearings were held on October 19, 1993, November 30, 1993 and December 2, 1993 at which respondent testified on his own behalf and called four mitigation witnesses, including his treating psychologist. Respondent also submitted numerous letters attesting to his good character. The following facts were adduced at the hearings.

*The Pesce Matter*

In or about December 1979, respondent was recommended to Anna Pesce to handle a possible medical malpractice action against her former gynecologist. During the following year, respondent investigated the underlying facts by obtaining Ms. Pesce's hospital and physician treatment records and by acquiring a specialist and potential expert witness, Dr. Schlussel, in order to evaluate the case.

By letter dated December 29, 1980, respondent inquired of Dr. Schlussel as to whether or not Ms. Pesce had been subject to medical malpractice. Enclosed with the letter were all relevant hospital records and doctors reports as well as a summary of Ms. Pesce's medical problems, including her perceived complications. By letter dated January 21, 1981, respondent wrote to Dr. Schlussel, with an enclosed $600 check, in order to obtain a medical evaluation.

Respondent, at some undisclosed later date, determined that Ms. Pesce did not have a case, based on Dr. Schlussel's advice as well as on discussions with other lawyers who specialized in medical malpractice work. The Statute of Limitations subsequently expired, in the ordinary course, at the end of 1982. During the ensuing 12 years, respondent represented Ms. Pesce on a number of other matters, all to her satisfaction.

On October 1, 1991, Ms. Pesce filed a complaint with the Departmental Disciplinary Committee, alleging that respondent neglected her case for 12 years. On November 4, 1991, the Committee forwarded a copy of the complaint to respondent, requesting an answer. By letter dated November 22, 1991, respondent advised Ms. Pesce that her medical malpractice matter had been settled for $11,000 and that it would take seven to eight weeks to obtain a check.

By letter to the Committee dated November 25, 1991 respondent asserted that a malpractice action was pending against Ms. Pesce's doctor in Supreme Court, Kings County, that he had explained to Ms. Pesce that the matter would be tried within the following year and one half, and that there was a prior settlement offer of $7,500, which his client had rejected. He further asserted that the settlement offer had been raised to $11,000, an amount Ms. Pesce had accepted. The parties stipulated that this letter falsely stated that Ms. Pesce had accepted an $11,000 settlement.

By letter dated January 24, 1992, respondent wrote to inform Ms. Pesce that he had not yet received the settlement

check; that it would be another two weeks before he acquired the check, and that he would notify her accordingly. The parties stipulated that the statements in this letter were false.

By letter dated February 10, 1992, the Committee informed Ms. Pesce that it would dismiss her complaint based upon the belief that she had been satisfied. Ms. Pesce thereafter filed a second complaint on March 25, 1992, asserting that she had still not received any settlement proceeds.

Respondent, by letter dated August 5, 1992, falsely stated that he had been in constant communication with the insurance company and that he had been assured the check would be issued by the end of the following week. By letters dated August 11, 1992 and August 17, 1992, the Committee requested respondent to answer Ms. Pesce's second complaint.

Respondent, by letter dated August 21, 1992, falsely informed Ms. Pesce that he was in receipt of the settlement check and that she should contact his office in order to arrange the method of transfer. By letter dated September 4, 1992, respondent advised Ms. Pesce he had enclosed her "share of the settlement check" and that he had not charged her for approximately $400 in expenses and had calculated his fee on a straight one-third contingency rather than on a sliding scale, thereby saving her approximately $430. Enclosed with the letter was a purported "Closing Statement" consisting of a preprinted Blumberg form providing the name of plaintiff and defendant, the alleged commencement date of the action and the allocation of the proceeds. All of the foregoing information was contrived.

Respondent then wrote to Ms. Pesce on or about October 1, 1992 inquiring as to why she had not cashed the check. The Notice of Charges filed by the Committee, however, asserts that no check was enclosed with the September 4, 1992 letter. Ms. Pesce testified to the same effect but respondent insisted that he wrote the check and produced a checkbook stub indicating that a check to Ms. Pesce in the amount of $6,900 had been issued on September 4, 1992. The Hearing Panel concluded that the Committee failed to meet its burden of proof with respect to the foregoing allegation.

Respondent, by certified letter dated October 29, 1992, forwarded a settlement check in the amount of $6,900 to Ms. Pesce. By letter dated October 30, 1992, respondent forwarded a copy of a letter response dated September 24, 1992 to the Committee, which the Committee had apparently not previ-

ously received. The September 24th letter falsely reasserted that a malpractice action had been brought against Ms. Pesce's doctor; that it had been settled in November 1991; that a settlement check had not been received until August 1992; and that a Closing Statement had been filed with the Office of Court Administration.

On December 28, 1992, respondent was personally served with a subpoena to appear before the Committee with his files concerning Ms. Pesce's matter and to provide the name of the insurance company that issued the settlement check as well as the contact person. Respondent informed the Committee that he could not appear on the appointed day but provided the name and address of the alleged contact person at the insurance company. The information, however, was false.

By amended response dated February 5, 1993, respondent admitted that he had not filed a suit on Ms. Pesce's behalf because he had forgotten about the matter and had decided to proceed as if the matter had been settled because of his relationship with the individual who recommended him to Ms. Pesce and his remorse about the case.

At the hearing, respondent asserted that he was reluctant to advise his client and her cousin (who recommended respondent) that there was no case; that he tried to avoid Ms. Pesce, who was not "the easiest client"; and that he later found it impossible to admit to the client and her cousin, who in the interim had become a New York State Supreme Court Justice, that he had "blown" the Statute of Limitations.

Respondent also opined that his neglect of the Pesce matter may have been fostered by personal problems he encountered in the 1980's which included: a divorce from his first wife, a prolonged child custody battle and a resulting drinking problem. In 1986, respondent began weekly psychotherapy which continues to date, and sold the family home; in 1987, his divorce was finalized; in 1988, a second custody battle began; and in 1988 and 1989, his two children began psychotherapy and his law partnership dissolved.

Dr. John P. Kildahl, respondent's treating psychologist, testified concerning the stress factors in respondent's life, his Type A personality and his treatment of respondent for depression over an extended period of time. Dr. Kildahl emphasized respondent's financial distress at the time the Mayo and Pesce matters converged, the long hours spent by his client on pro bono election work and the continued acrimony with his ex-wife.

In a posthearing letter, Dr. Kildahl wrote of the panic that overtook respondent when Ms. Pesce's complaint was filed against him and the exhaustion from which respondent suffered as the result of "being perhaps, too good a neighbor * * * to community groups, to relatives, to friends, to friends of friends, to the financially indigent, and especially to political figures". Dr. Kildahl characterized respondent's behavior as an aberration and asserted that respondent's personal life and law practice are now on a more solid foundation.

### The Mayo Matter

In late 1991, a client named Ms. Mayo (also known as McDuffie) asked respondent to take over a matter from a prior law firm concerning an accident in which her son had broken his nose in a public school. After looking into the matter, respondent ascertained that although the client had been offered a settlement of $18,500 by the City, the case had been marked off the calendar, which the attorney of record, Mr. Estrin, was unaware of.

Upon evaluating the case, respondent advised Ms. Mayo that the settlement offer was fair and she should accept it. Mr. Estrin, however, determined that the City would no longer settle for $18,500, but instead offered $12,000. Because the matter had been marked off the calendar without his knowledge, Mr. Estrin agreed to pay the difference out of his own pocket.

In September 1992, Ms. Mayo advised respondent that they were in dire financial straits because her husband left her and she was being evicted from her apartment. Thereafter, Mr. Estrin, as the result of the respondent's efforts, forwarded a $6,000 check to respondent, who deposited it in his escrow account, kept $1,000 as his fee, and forwarded the remaining $5,000 to Ms. Mayo.

On or about October 15, 1992, Mr. Estrin gave respondent a check for $12,500 which represented the balance of the settlement sum due Ms. Mayo. Although respondent deposited the check into his IOLA account on October 16, 1992, he did not turn over the $12,500 proceeds to his client until April 1993.

In the interim, respondent wrote checks to Ms. Pesce and to himself (apparently for rent on his office) which, after Ms. Pesce negotiated her check, left a negative balance in the IOLA account. On or about February 4, 1993, respondent deposited his IRS refund check into his IOLA account.

On or about March 15, 1993, Ms. Mayo contacted Mr. Estrin inquiring as to why she had not yet received the balance of the settlement and by letter of the same date, Mr. Estrin advised respondent to immediately turn over the previously forwarded money. Respondent denies receiving this letter.

By letter dated April 12, 1993, Mr. Estrin strongly suggested that respondent turn over the money immediately, characterized respondent's behavior as highly irregular, and stated that he hoped to resolve the issue without the need of the Appellate Division's intervention. On or about April 23, 1993, approximately six months after receiving the monies, respondent forwarded the sum to Ms. Mayo.

At the hearing, respondent admitted that he had no justification for failing to pay Ms. Mayo promptly and stated that he made no record of the incoming check or of its deposit into his IOLA account and had simply forgotten to pay her. Respondent, however, admitted that he was always under some kind of financial distress and the record submitted to the Hearing Panel indicated that respondent was juggling his financial commitments.

Based upon the evidence presented, the Hearing Panel sustained Charges 1, 2, 3, 5 and 6 and Charge 4, in part. The Hearing Panel concluded that respondent neglected Ms. Pesce's medical malpractice action for 12 years and allowed the Statute of Limitations to run, thereby neglecting a legal matter entrusted to him in violation of DR 6-101 (A) (3) (22 NYCRR 1200.30 [a] [3]); misrepresented the status of Ms. Pesce's medical malpractice claim to both the client and the Committee, in violation of DR 1-102 (A) (4) and (5) (22 NYCRR 1200.3 [a] [4], [5]); presented fraudulent documents to Ms. Pesce and to the Committee to support his false claim that a settlement had been reached in Ms. Pesce's matter with the insurance company, in violation of DR 1-102 (A) (4) and (5) (22 NYCRR 1200.3 [a] [4], [5]); commingled his funds with monies of his clients in his IOLA account, in violation of DR 9-102 (A) (22 NYCRR 1200.46 [a]); and engaged in conduct that adversely reflected upon his fitness to practice law in violation of DR 1-102 (A) (8) (22 NYCRR 1200.3 [a] [8]).

With respect to Charge 4, which alleged that respondent converted funds intended for Ms. Mayo by allowing his IOLA account to drop below $12,500 in violation of DR 1-102 (A) (4) and DR 9-102 (A) (22 NYCRR 1200.3 [a] [4]; 1200.46 [a]), the Panel sustained the violation of DR 9-102 (A) (22 NYCRR

1200.46 [a]) only. In doing so, the Hearing Panel concluded that respondent's handling of the IOLA account did not involve an intent to permanently deprive his clients of their funds.

In mitigation of respondent's conduct, the Hearing Panel considered the testimony of respondent and his psychologist concerning the stress in respondent's life and also reviewed letters from Judges, clients and adversaries that spoke of respondent's good character and reputation. Further, the Panel took into account respondent's prior unblemished disciplinary record and the extensive legal work respondent has done for a number of community organizations. Respondent has represented the Park Slope Community Council in its efforts to create a shelter at an armory, has represented numerous parent slates in school board elections and has served for the past eight years as a volunteer at a homeless shelter in Brooklyn Heights, which includes serving meals and spending one night per month at the shelter.

At the conclusion of the hearing, staff counsel recommended that respondent be disbarred and respondent's counsel recommended no suspension be imposed, but in the event a suspension be deemed appropriate, that it not exceed two years.

On March 29, 1994, the Hearing Panel issued its written report recommending that respondent should be suspended from the practice of law for two years. By petition dated June 20, 1994, the Disciplinary Committee seeks an order confirming the Hearing Panel's findings of fact, disaffirming in part the Hearing Panel's conclusions of law and disaffirming its recommended sanction and instead disbarring respondent. Respondent opposes the Committee's petition only insofar as it seeks a recommendation of a harsher sanction and otherwise requests that the Hearing Panel's report be confirmed in its entirety.

A review of the evidence presented in the case at bar indicates that there is ample support for the Hearing Panel's findings that respondent neglected the Pesce matter for approximately 12 years and allowed the Statute of Limitations to run in violation of DR 6-101 (A) (3) (22 NYCRR 1200.30 [a] [3]); misrepresented the status of Ms. Pesce's medical malpractice action to both the client and the Committee in violation of DR 1-102 (A) (4) (22 NYCRR 1200.3 [a] [4]); presented fraudulent documents to Ms. Pesce and the Committee to support his false claim that a settlement had been reached in Ms. Pesce's

matter with the insurance company in violation of DR 1-102 (A) (4) and (5) (22 NYCRR 1200.3 [a] [4], [5]); commingled his personal funds with his clients' funds in his IOLA account in violation of DR 9-102 (A) (22 NYCRR 1200.46 [a]); and engaged in conduct that adversely reflected upon his fitness to practice law in violation of DR 1-102 (A) (8) (22 NYCRR 1200.3 [a] [8]).

With regard to Charge 4, which alleges conversion of clients' funds, the Hearing Panel, based upon the evidence presented, properly sustained the violation of DR 9-102 (A) (22 NYCRR 1200.46 [a]) and not DR 1-102 (A) (4) (22 NYCRR 1200.3 [a] [4]).

In *Matter of Altomerianos* (160 AD2d 96, 102), we held that: "We emphasize, again, that misappropriated funds used by an attorney for personal purposes makes the 'conversion' much worse than if the funds are misappropriated for reasons the attorney honestly believes to be consistent with his obligations as a fiduciary, but, even so, absent a finding of venal intent, the particular use to which the misappropriated funds are put bears mainly on the gravity of the violation of DR 9-102 (A) and not to whether there has been a violation of DR 1-102 (A) (4). The latter charge should be reserved for conduct that is fraudulent within the meaning of the 'Definitions' section of the Code of Professional Responsibility and generally warrants disbarment. In short, we simply do not think that it can be fairly said of respondent that his conduct in this matter was dishonest and deceitful."

In the case at bar, respondent admittedly used his IOLA account as a firm operating account, mixing client funds with his own personal funds. There was, however, no finding, or evidence, that respondent acted with a venal intent when he used $6,900 of Ms. Mayo's funds in a misguided attempt to compensate Ms. Pesce for his mistakes with regard to her medical malpractice case. Both Ms. Pesce and Ms. Mayo were made whole and received their funds as agreed even though the payments were delayed.

Further, we are mindful, as was the Hearing Panel, of various mitigating factors, such as respondent's prior unblemished record as well as the fact that respondent was engaged in considerable *pro bono* work and public interest activities. As a result, we conclude that a suspension, rather than disbarment, is warranted. *(See, Matter of Altomerianos, supra* [where we found that no venal intent existed where the attorney used client funds, and imposed a two-year suspen-

sion]; *Matter of Altschuler,* 139 AD2d 311 [where we found that the conversion of the proceeds of five checks, coupled with various mitigating circumstances, as well as the lack of intent to steal or deprive the client, warranted a two-year suspension]; *Matter of Weingrad,* 196 AD2d 300, *lv denied* 83 NY2d 756 [where we held that a one-year suspension was appropriate for an attorney who commingled escrow money and converted clients' funds, but did so without venal intent, and who had engaged in *pro bono* and public interest activity].)

Accordingly, the Disciplinary Committee's petition is granted to the extent that the Hearing Panel's findings of fact are confirmed. The petition is otherwise denied, the Hearing Panel's conclusions of law are also confirmed and respondent is suspended from the practice of law for a period of two years.

CARRO, J. P., ELLERIN, WALLACH, ASCH and TOM, JJ., concur.

Application granted only to the extent of confirming the Hearing Panel's findings of fact, and the petition is otherwise denied; the Hearing Panel's conclusions of law are also confirmed and respondent is suspended from practice as an attorney and counselor-at-law in the State of New York for a period of two years, effective December 15, 1994, and until the further order of this Court.