[906 NYS2d 16]

In the Matter of FREDERICK WILLIAM SALO, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, July 27, 2010

**APPEARANCES OF COUNSEL**

*Alan W. Friedberg, Chief Counsel, Departmental Disciplinary Committee*, New York City (*Stephen P. McGoldrick* of counsel), for petitioner.

*Michael S. Ross* for respondent.

**OPINION OF THE COURT**

Per Curiam.

Respondent Frederick William Salo was admitted to the practice of law in the State of New York by the Third Judicial Department on March 1, 1994. At all times relevant to this proceeding, he has maintained an office for the practice of law within the First Judicial Department.

In this proceeding, the Departmental Disciplinary Committee (DDC) seeks respondent's disbarment or, in the alternative, his suspension from the practice of law for no less than three years. The six charges at issue (two others having been withdrawn) are summarized below.

Charge one alleges that respondent misappropriated third-party funds from his escrow account in violation of Code of Professional Responsibility DR 9-102 (a) (22 NYCRR 1200.46 [a]). This charge relates to respondent's representation of a client (Jose Orellana) whose personal injury action was settled for $198,000 in December 2001. After respondent made payments on account of the settlement to Orellana and himself out of his Chase Bank IOLA account, $40,000 remained in the IOLA account. As respondent wrote in a subsequent letter to Orellana, he continued to hold the $40,000 in the IOLA account pending resolution of the lien held by Reliance Insurance Company (Reliance) on the settlement proceeds based on its payment of worker's compensation benefits. Because Reliance went into receivership, its lien was not resolved until June 1, 2005. During the period from October 15, 2002 through April 22, 2005, respondent withdrew funds from the IOLA account that caused its balance to fall below the amount of the Reliance lien, whether the lien amount is deemed to have been $40,000 (the amount of Reliance's original claim) or, as respondent argues, $32,000 (the reduced amount to which Reliance's successor finally agreed on April 28, 2005). The balance on deposit in the IOLA account first fell below $32,000 on March 31, 2003, and dropped to a low of $102.88 on April 2, 2005.

Charge two alleges that respondent, by intentionally converting third-party funds to his personal use as alleged in charge one, engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4]).

Charge five alleges that respondent commingled funds by transferring funds from his personal bank account to his IOLA

account in violation of DR 9-102 (a) (22 NYCRR 1200.46 [a]). This charge is based on respondent's transfer of $32,000 of his personal funds to his IOLA account on or about January 12, 2004, and on a second deposit of personal funds in the amount of $32,100 into the IOLA account on April 27, 2005. The latter deposit was the source of the funds used to pay off the Reliance lien on June 1, 2005.

Charge six alleges that checks drawn on respondent's IOLA account did not contain a designation indicating that they were issued from a special bank account, thereby violating DR 9-102 (b) (2) (22 NYCRR 1200.46 [b] [2]).

Charge seven alleges that, on or about November 7, 2003, respondent paid a client settlement funds by giving him a check drawn on respondent's IOLA account that was made payable to "cash," thereby violating DR 9-102 (e) (22 NYCRR 1200.46 [e]).

Charge eight alleges that, by engaging in the conduct underlying the above charges, respondent engaged in conduct that adversely reflects on his fitness as a lawyer in violation of DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]).

Respondent admits the factual allegations underlying the above charges, and does not contest charges five, six and seven. He does, however, dispute the contention that he acted with venal intent, and therefore does contest charge two, as well as charge one to the extent it incorporates allegations of venal intent. He also contests charge eight.

The primary issue before us is whether respondent's conversion of escrow funds was, in light of the post-traumatic stress disorder (PTSD) and depression from which he suffered at the time, done without venal intent. Respondent argues that, because he acted under the influence of the aforementioned psychological maladies and without venal intent, the sanction for his misconduct should be limited to a public censure.

At the hearing held before a Referee on March 28, 2007, the expert psychological/psychiatric reports submitted by both sides were in agreement that respondent suffered from PTSD at the time of the conduct at issue (December 2001 through April 2005).[1] Respondent argues that there was no intentional conversion of funds; rather, he unknowingly and inadvertently used

1. The report on behalf of respondent was submitted by his treating psychologist, Dr. Jill Levitt; the report on behalf of the Departmental Disciplinary Committee was submitted by Dr. Amy S. Hoffman, a psychiatrist. Because each report was received into evidence without objection, neither expert testified at the hearing.

the lien funds for his own use because at the time he suffered from severe PTSD and depression triggered by the attacks of September 11, 2001 (9/11). He further contends that he was unable to reconcile his IOLA account during the relevant time period, which was related to his practice of keeping a "cushion" of earned legal fees in his IOLA account.[2] Thus, he thought he was using his own money to pay personal expenses. Notably, during the period in question (2003-2005), respondent withdrew funds from his "cushion" of fees at the same rate as when he first opened the IOLA account in late 1998. Respondent also contends that he had no motive to misappropriate third-party funds, given that he allegedly had sufficient funds in a brokerage account to cover all personal expenses.

In support of his contention, respondent raises a number of points about his personal background. First, as confirmed by both mental health experts, while growing up he suffered greatly under an emotionally and physically abusive father and passive mother. According to the experts, this set the stage for the onset of severe PTSD after 9/11, manifested by feelings of loss of control, anxiety, panic attacks and nightmares.

Respondent was also hampered in meeting his professional obligations in the wake of 9/11 by the location of his law office, which was 100 Church Street, in the immediate vicinity of the World Trade Center. Although he was not at his office at the time of the attack, he had only limited access to it for many months thereafter. When he was given access to the office during this period, he was escorted by the police up 18 flights of stairs, in the dark (there was no power), and he was given only a few minutes to collect files that had survived the attack. His computer, on which the electronic ledger of his IOLA account had been stored, was destroyed, as were most of his files. Moreover, he did not receive bank statements for several months due to problems with mail service.

In October 2002 (years before the DDC opened its inquiry into this matter), respondent sought psychological treatment from the aforementioned Dr. Levitt. In her report, Dr. Levitt confirmed that respondent descended into alcohol abuse following 9/11 as a coping mechanism. The alcoholism continued until

---

**2.** Respondent states that it was not until 2005, when he was so advised by his ethics counsel, that he became aware of the impropriety of his practice (which predated 9/11) of keeping a "cushion" of earned fees in his IOLA account. It does not appear that any of the charges before us are based on respondent's having engaged in this practice.

he stopped drinking completely in January 2003. During the period in question, he was not taking on any new cases, as he could barely function as an attorney. During the period from 2002 through 2005, he settled 17 cases, which was about what a busy personal injury attorney typically would accomplish in one month. As stated in her report, Dr. Levitt found that respondent experienced "extreme anxiety related to his work as a lawyer, and was even worried about such activities as opening mail and returning phone calls, for fear that he would hear more bad news and not be able to cope with it." She noted that, when respondent began treatment, he "was barely getting any work done"; that he had "stacks of unopened mail sitting on his desk that he was too anxious to open"; that it was "difficult for him to sustain concentration on any one task"; and that "[s]ometimes he would lose track of time and would spend the entire day writing one letter."

Based on her observations, Dr. Levitt diagnosed respondent as suffering from PTSD and major depressive disorder related to 9/11 and the abuse he suffered as a child. The PTSD was manifested by symptoms including intense fear and feelings of helplessness, difficulty in concentrating, avoidance, hyperarousal, and significant impairment in daily functioning. As relevant to this proceeding, Dr. Levitt concluded that it was

> "likely that [respondent's] PTSD symptoms interfered with his ability to focus on reconciling his attorney trust bank account . . . Like other anxiety-producing activities, reconciling his accounts was an activity that he avoided for an extended period of time . . . [H]is inability to work consistently on anything other than the immediate task at hand, combined with his problems with intrusive and disorganized memories that sometimes led to states of confusion, could have led to mistaken judgment and his misperception of the source of the funds in his attorney trust bank account. I further believe with a reasonable degree of scientific certainty that because of his PTSD symptoms Mr. Salo avoided reconciling his bank accounts, and had he undertaken the task of doing such reconciliations, his PTSD symptoms would have interfered with his ability to successfully complete the task."

Similarly, the DDC's expert, Dr. Hoffman, adopted Dr. Levitt's findings and independently determined the following:

"[I]t is my opinion, to a reasonable degree of medical certainty, that Mr. Salo suffers from the results of chronic childhood physical and emotional abuse, from symptoms consistent with a depressive disorder, symptoms consistent with an anxiety disorder and with [PTSD]. I believe that at the time of the actions which are under investigation, Mr. Salo was in dire psychological condition as described . . . in Dr. Leavitt's [*sic*] affidavit. He appears to have been unable to function effectively. However, it is also my opinion, to a reasonable degree of medical certainty, that Mr. Salo has made significant and meaningful improvement due to his wholehearted engagement in a treatment process and that, at the present time, he is fully able to perform as an attorney."

Notwithstanding the experts' agreement that respondent suffered from PTSD at the time of his alleged misconduct, the DDC argued that several factors weighed against mitigation. Notwithstanding his abusive upbringing, respondent was able to achieve academically and professionally before 9/11. After 9/11, he was able to negotiate the settlement of several matters (including the Orellana matter underlying charges one and two) and was able to prepare proper closing statements and to disburse the correct amounts of proceeds in each matter. It was only the proceeds of the Orellana settlement subject to the Reliance lien that respondent failed to safeguard properly; such funds were available for misappropriation until 2005 because of the delay in resolution of the lien due to Reliance's insolvency and pending liquidation. Further, respondent prepared and filed his own personal income tax forms and renewed his biennial attorney registration for the years 2002 through 2005.

The Referee found, based on the expert reports of Drs. Levitt and Hoffman, that respondent's PTSD played a substantial role in bringing about the misconduct underlying the most serious charges (i.e., those concerning the misappropriation of the Reliance lien funds from the Orellana settlement proceeds). However, he found that respondent, despite his somewhat diminished capacity, still was "aware on some cognitive level that he was using third party funds to pay for personal expenses." The Referee noted that the experts did not

"specifically address the question as to why Respondent from August 23, 2003 until May 2005 did not, or could not, realize from observing his monthly

statements that the amount necessary for the Reliance lien fund was not in the account and at times well below the amount which was required. This is especially so since Respondent, during the years 2003-2005, was able to settle other actions, place the proceeds in the IOLA account and properly disburse the proceeds . . . I do not credit Respondent's testimony that it was not until April 2005 that he was feeling well enough to be able to reconcile his IOLA account and only then first realized that the Reliance lien funds were invaded.

"My difficulty with reaching the conclusion which Respondent advances, i.e., that he was unaware due to severe PTSD that he was using third party funds to pay personal expenses since he believed that he had a 'cushion' of earned legal fees, also stems from Respondent's actions both before and after 9/11. Upon the opening of the IOLA account in 1998 Respondent failed to use the special designation legend of escrow funds required by the rules. Prior to 9/11, Respondent readily admits to commingling his earned fees to provide a 'cushion' which is also a violation of the escrow account rules. Following 9/11, Respondent was able to negotiate a settlement of the Orellana action; to disburse payment to his client; to pay himself his fee of $66,000.00; and to hold back $40,000.00 to satisfy the Reliance lien. Respondent also performed other tasks, maybe not as well as earlier but nonetheless sufficiently enough, during the time the Reliance proceeds were invaded by him to pay personal expenses . . .

"I believe that the seed for the Reliance lien fee misappropriation was sown from the day in 1998 when Respondent opened the IOLA account with the improprieties concerning the account admitted to as noted above, especially the concept of a 'cushion' representing the legal fees. After 9/11 and the onset of severe PTSD, and resort to alcohol to cope with its effects, Respondent was still able to perform many tasks as noted above, and the symptoms abated over the years but Respondent continued to invade the Reliance lien funds in 2004-2005.

"Accordingly, I find that the DDC has established

by a preponderance of the evidence that Respondent knowingly converted third party funds for his own use at various times between 2003 and 2005 and . . . therefore I sustain all of the charges" (citations and emphases omitted).

The Referee recommended, by reason of the "extremely unusual mitigating circumstances" of respondent's psychological condition at the relevant time, that he be suspended for only one year, rather than disbarred or suspended for at least three years, as sought by the DDC.

The Hearing Panel, over a dissent by one member, adopted the Referee's determinations and recommendation. The dissenting Panel member recommended that charges two and eight be dismissed, that charges one, five, six, and seven be sustained, and that the sanction be limited to a public censure.

The DDC now moves for an order pursuant to 22 NYCRR 603.4 (d) and 605.15 (e) (2) confirming the reports of the Referee and Hearing Panel to the extent that they sustained all the charges against respondent, disaffirming said reports to the extent that they found a causal connection with respondent's PTSD and his misconduct and that the PTSD constituted extremely unusual mitigating evidence warranting a one-year suspension and, instead, disbarring respondent. In the alternative, the DDC seeks a suspension for a period of no less than three years. By cross motion, respondent seeks an order denying the DDC's motion and imposing the sanction of public censure. We grant the DDC's motion to the extent of confirming the determinations of the Referee and the Hearing Panel insofar as they sustained charges one, five, six, seven and eight, deny respondent's cross motion, and impose the sanction of a one-year suspension from the practice of law.

As noted, respondent does not contest charges five, six and seven, and such charges are sustained. With regard to charge one, concerning the misappropriation of third-party funds, respondent does not deny that he invaded (whether intentionally or not) proceeds of the Orellana settlement in his IOLA account subject to the Reliance lien; accordingly, charge one is also sustained. Charge two—alleging that respondent's invasion of funds subject to the Reliance lien constituted conduct involving dishonesty, fraud, deceit or misrepresentation in violation of DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4])—cannot be resolved so simply. In order to find an intentional conversion violating DR 1-102 (a) (4), a showing of intent to defraud, deceive or misrep-

resent is required (*see Matter of Altomerianos*, 160 AD2d 96 [1990]). Notwithstanding the Referee's careful analysis of the evidence, to which the majority of the Hearing Panel deferred, it cannot be ignored that the mental health experts for both sides were in agreement that respondent invaded the Reliance lien funds inadvertently, without specifically intending to misappropriate third-party funds, as the direct result of the PTSD from which he suffered at the time. Again, it was the view of both experts that respondent, by reason of his PTSD (which caused him to stop opening mail, including bank statements), lost track of the fact that the balance remaining in his IOLA account was subject to the Reliance lien on the proceeds of the Orellana settlement, and believed that he was drawing on the "cushion" of earned legal fees it was his practice to keep in the account.[3] Given the uncontroverted expert evidence, we find that it has not been proven by a preponderance of the evidence that respondent had the venal intent required for a finding that he willfully and knowingly converted third-party funds. In coming to this conclusion, we also find it significant that respondent had no evident motive to convert third-party funds (since it is uncontroverted that he had sufficient funds of his own to meet his personal expenses); that no other instances of conversion, either before or since, have been alleged; and that neither the client nor the lienholder was harmed by respondent's conduct. Accordingly, the DDC's motion is denied, and the findings of the Referee and Hearing Panel are modified, to the extent of dismissing charge two.

Charge eight, which alleges that respondent's conduct underlying the other sustained charges constituted conduct adversely reflecting on his fitness to practice law in violation of DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]), is sustained.

As to the matter of the sanction to be imposed, there are cases in which suspension from the practice of law for a substantial period of time is the appropriate sanction for even nonvenal misappropriation of funds. For example, in *Matter of Tepper*, (286 AD2d 79 [2001]), we imposed a two-year suspension for misconduct including "careless and nonvenal invasions of client funds for personal or business uses" (*id.* at 81) where, although "there was no evidence of venality and no losses were suffered by any of the parties affected by respondent's actions,

---

3. We emphasize that respondent's practice of keeping a "cushion" of earned fees in his IOLA account was by no means proper. The practice was not, however, venal in itself.

nevertheless respondent also demonstrated flagrant irresponsibility in his bookkeeping and check writing" (*id.* at 80; *see also Matter of Weingrad*, 196 AD2d 300 [1994], *lv denied* 83 NY2d 756 [1994], *cert denied* 513 US 877 [1994] [one-year suspension for nonvenal conversion of client funds]; *Matter of Altomerianos, supra* [two-year suspension for nonvenal conversion]). Under the particular circumstances of this case, we find that the appropriate sanction is a one-year suspension from the practice of law.

Accordingly, the motion of the DDC is granted to the extent of sustaining charges one, five, six, seven and eight, and to the extent of suspending respondent from the practice of law for a period of one year, effective 30 days after the date hereof and until further order of this Court, the motion is otherwise denied, and respondent's cross motion for imposition of the sanction of public censure is denied.

GONZALEZ, P.J., ANDRIAS, SAXE, FRIEDMAN and CATTERSON, JJ., concur.

Respondent suspended from the practice of law in the State of New York for a period of one year, effective August 25, 2010. Cross motion denied.