Matter of Wright (2025 NY Slip Op 00633)

Matter of Wright

2025 NY Slip Op 00633

Decided on February 04, 2025

Appellate Division, First Department

PER CURIAM 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: February 04, 2025
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Hon. Troy K. Webber
Justice Presiding
Peter H. Moulton Martin Shulman John R. Higgitt Kelly O'Neill Levy
Justices.

Motion No. 2024-03340 Case No. 2024-04216 

[*1]In the Matter of Richard John Wright, an Attorney: Attorney Grievance Committee for the First Judicial Department, Petitioner, Richard John Wright (OCA Atty. Reg. No. 4067112), Respondent.

Disciplinary proceedings instituted by the Attorney Grievance Committee for the First Judicial Department. Respondent, Richard John Wright, was admitted to the Bar of the State of New York at a Term of the Appellate Division of the Supreme Court for the Second Judicial Department on September 18, 2002.

Jorge Dopico, Chief Attorney,
Attorney Grievance Committee, New York (Christopher S. Ronk, of counsel), for petitioner.
Respondent, pro se.

PER CURIAM 

Respondent Richard J. Wright was admitted to the practice of law in the State of New York by the Second Judicial Department on September 18, 2002, under the name Richard John Wright. At all times relevant to this proceeding, respondent maintained a registered address in the First Judicial Department.
The Attorney Grievance Committee (the Committee) seeks an order pursuant to Rules for Attorney Disciplinary Matters (22 NYCRR) § 1240.9(a)(3) and (5), immediately suspending respondent from the practice of law until further order of the Court, based on his failure to produce bookkeeping records and other documents as repeatedly directed by the Committee, which he is required to maintain under Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.15(d); and based on his admission that he took more than the one-third contingency fee in personal injury matters to which he was entitled, and provided financial assistance to clients and failed to explain the details thereof despite the Committee's request.
On January 6, 2020, the Committee received notification from the Lawyers' Fund for Client Protection that on November 29, 2019, a $140,000 check issued from respondent's attorney escrow account was dishonored due to insufficient funds. On or about March 18, 2020, the Committee received a complaint from V.R., whom respondent represented in an unrelated case, alleging that respondent had failed to release escrow monies to her from a grant that had been awarded to V.R and her brother in connection with jointly-owned property that was the subject of a partition action. By September 14, 2020 answer, respondent asserted that he had remitted to V.R her share of the escrow monies.
By January 31, 2020 letter, the Committee requested that respondent submit a written explanation for the dishonored escrow check and produce required bookkeeping records within 20 days. By answer dated March 9, 2020, respondent asserted that the check was dishonored due to his not having included information required by the fraud protection feature the bank placed on his account; he included a closing statement for the matter at issue (with the same date as his answer) and a two-page summary transaction report, but not the bookkeeping records or a statement that he did not possess the requested documentation. On February 26, 2021 respondent produced bank statements, pages from his check register, and 13 pages of handwritten notes, which [*2]he represented as his account ledger. The records were admittedly incomplete, and the information contained therein was not contemporaneously recorded. Respondent requested a short adjournment to provide the Committee with "Retainer and Closing Agreements" noting that he anticipated retrieving some files in storage within a few days.
By letter dated June 4, 2021, the Committee requested that respondent complete a spreadsheet prepared by its investigative accountant based on the bookkeeping records he provided. The Committee asked respondent to identify, among other things, the source of all deposits and the recipients of all funds disbursed and the client matters to which they pertained. In addition, respondent was asked to include corroborating documentation, including retainer agreements, and if none was signed for any client matter, so state and explain. He was also told to state whether he maintained any ledger during the audit period aside from the handwritten list of transactions he previously submitted. The Committee directed production within three weeks. On October 1, 2021, respondent confirmed that the Committee's spreadsheet was accurate. He submitted records virtually identical to those previously provided, except with client names included, but did not address the queries concerning the existence of ledgers or retainer agreements.
By two October 28, 2021 letters, the Committee requested that respondent produce additional documents and information related to his apparent over disbursement of recoveries in at least three separate client matters; his paying himself a legal fee of $296,000 out of a $675,000 recovery in the G.B. matter (in the which he issued the $140,000 dishonored check); the purpose and client matters pertaining to transfers he made from his escrow account to his operating account between May 2019 and January 2020; an explanation of the reversed payments and transfers from his escrow account between October 2019 and September 2020; and an explanation of the circumstances under which he had provided his clients with financial support. As to the V.R. complaint, the Committee requested documentary proof that opposing counsel had agreed that he could release $16,141 of the disputed escrow monies to his client and reiterated its query concerning the existence of any ledger. The Committee directed respondent to provide the information by January 3, 2022. Respondent did not comply.
Respondent was served with a judicial subpoena directing him to appear before the Committee on March 2, 2022 for a deposition, which was twice adjourned because respondent failed to fully respond to the Committee's production requests.
On April 13, 2022, respondent appeared for deposition, but did not produce the documents and information requested by the Committee months prior. He claimed the emotional strain of the disciplinary investigation and the demands of his law practice caused his delay, but that he appreciated the seriousness and importance [*3]of the investigation. The Committee gave respondent an additional extension of approximately three weeks to provide the materials and adjourned the deposition to May 9, 2022. By May 5, 2022 email to the Committee, respondent apologized for the delay and stated that he would send responses that day. However, respondent did not do so or contact the Committee to explain his continued noncompliance. By letter of October 17, 2022, the Committee directed respondent to respond to the outstanding requests by October 31, 2022 and advised that failure to do so could result in interim suspension.
By two letters dated October 31, 2022, respondent only partially responded to the outstanding requests. He failed to include proof that opposing counsel in the V.R. matter had consented to the release of the escrow funds or provide the requested escrow account records despite respondent's representation that they were included.
On March 3, 2023, the Committee again directed respondent to produce escrow account records covering the period between October 2017 and February 2019 by March 10, 2023, again warning that failure to do so could result in his interim suspension. On March 10, 2023, respondent produced several pages of handwritten notes covering dates in that period. There was no explanation of whether the records were created contemporaneously and no bank statements or other escrow account records included.
The Committee then subpoenaed the bank for the escrow account records, after which respondent appeared for his continued deposition. Respondent acknowledged that he had not provided all the requested documents but promised to do so. As to the dishonored $140,000 check in the G.B. matter, respondent reiterated that it was due to his having not inputted information required by his bank's fraud protection program. When the Committee pointed out that the account balance immediately before respondent issued the check was just over $101,000, Respondent conceded that he had made an accounting error. He stated that he should have held back approximately $200,000 from G.B.'s settlement to repay a loan she took against the settlement, as well as medical liens, and that he had to pay approximately $60,000 of his own funds to satisfy the liens after having mistakenly failed to deduct the amounts from G.B.'s settlement funds at the time of disbursement. When asked on a later date about having paid himself a legal fee of $296,000 whereas the closing statement he produced stated that he was entitled to a fee of $184,757.42, respondent attributed the overpayment to an accounting error, which he claimed to have "rectified . . . for this never to occur again." The Committee pointed out that respondent's bookkeeping records showed that he paid G.B. $260,000, but per the closing statement, G.B. was entitled to $293,514. Respondent averred that he must have paid G.B. (to whom he claimed to have provided financial assistance over the years) an additional $33,000 at some point but [*4]was unable to cite where his bookkeeping records evidenced such payment.
Respondent testified that there were other instances where he paid liens or judgments against his clients' recoveries from his personal funds due to miscalculations he made when disbursing settlement funds. He testified that he routinely provided financial assistance to his predominantly indigent clients from his personal funds and in so doing, may have violated rule 1.8(e), unless he was representing the clients pro bono.
As to the V.R. matter, respondent claimed that while opposing counsel first objected in writing to his disbursing the escrow funds to his client, counsel later gave him verbal permission to do so. V.R. was entitled to approximately $16,141.23, but respondent disbursed $18,000 to her, and in so doing, overpaid V.R. by over $1,800. Respondent claimed that the overpayment came out of his personal funds, namely, earned legal fees that he left on deposit in his escrow account.
On October 2, 2023, the Committee directed respondent to produce his federal and state tax returns for 2019 through 2022 and any and all retainer and settlement agreements for the period September 30, 2017 through May 28, 2021 (or state if he did not have them) by October 17, 2023. The Committee again warned respondent that failure to comply could result in his interim suspension. By October 18, 2023 email, respondent produced some of the requested documents, including tax returns, but did not produce the agreements or state whether he had them. Rather, respondent produced retainer and closing statements filed late with the Office of Court Administration on October 11 and 17, 2023, along with requests he submitted therewith that they be accepted as nunc pro tunc filings.
Between October 19, 2023 and February 5, 2024, the Committee emailed respondent several times demanding production of the missing retainer and settlement agreement information. The Committee also directed respondent to produce supplemental tax information, including an explanation as to the source of funds shown in Schedule C of the returns that he had provided. By February 5, 2024 email, respondent apologized for not responding to the Committee earlier as he had been out of state attending to his mother who had been terminally ill and recently passed away. By February 20, 2024 letter, the Committee directed respondent to comply with the outstanding production requests by February 23, 2024 and again warned that failure to do so could result in his interim suspension. Respondent did not respond.
As to disbursement of funds in other specific client matters, respondent testified at his continued deposition on March 8, 2024, that in connection with his representation of C.G., whose matter he settled for $40,000, respondent stated that he was entitled to a one-third contingency fee (approximately $13,200) but paid himself a legal fee of $20,000. Further, the closing statement he filed in the matter listed a total disbursement [*5]of $43,756. Respondent stated that the additional $3,756 represented a legal fee C.G. owed him for representing her husband in an immigration matter.
Also, in connection with his representation of another client, Go.B., respondent obtained a $15,000 recovery from which he paid himself a legal fee of $14,000. Respondent (who estimated that he had provided Go.B. with $20,000 to $30,000 in financial assistance over the years) claimed that he later refunded the $14,000 to Go.B. Respondent also stated that he over disbursed Go.B.'s total recovery by approximately $2,634, which he attributed to a miscalculation.
Respondent again admitted that he kept earned legal fees in his escrow account, which he would withdraw in increments over time, out of which he would provide financial assistance to his clients of limited means. Respondent explained that due to the demands of his busy practice, he was frequently delayed in performing final calculations with respect to his clients' personal injury matters, which he now realizes was wrong.
Respondent attributed the approximately 10 reversals of disbursements from his escrow account reflected in the bank records to the fraud protection feature on his account (e.g., respondent did not input the correct check information, the clients deposited their checks too soon, or their banks did not accept fraud-protected checks).
As to the Committee's repeated requests for corroborating documents concerning respondent's settlements of certain client matters, namely, retainers, stipulations of settlement, final lien letters, litigation funding bills, and copies of checks, respondent stated that he had this material, but that his files were in storage and that he would have to take time off from his law practice to go through them and retrieve them, for which delay he apologized. As to the Committee's requests for information as to the source of the income reflected on Schedule C of respondent's tax returns for 2019 through 2022, respondent stated that it pertained to the estimated net income from his law practice for those tax years for which he intended to file amended tax returns. Respondent acknowledged that he understood what the Committee was requesting.
The Committee argues that respondent's interim suspension is warranted because he has continuously failed to comply with the Committee's numerous requests for documents and information made in connection with its investigation; and the evidence, including respondent's deposition testimony, establishes that he converted or misappropriated client funds in several matters by paying himself more than he was entitled to under his one-third contingency fee arrangements with his clients.
Respondent avers that his law practice is focused on representing indigent clients to whom he provides pro bono or "low bono" legal services and in many instances he has absorbed his clients' expenses because they could not afford to pay them. Respondent, though "not a person of financial [*6]wealth," has provided financial assistance to "hundreds of clients," who requested it which requests he could not refuse as he himself comes from a humble background and had experienced food and housing insecurity. He further notes that his office has offered free paralegal training to over 300 students over the years.
As to the dishonored check in the G.B. matter, respondent again points to a miscalculation. He expresses remorse and promises the Court that it will not occur again. Also, as noted, respondent overpaid himself by approximately $112,000 in the matter; and his closing statement reflected that G.B. was entitled to $293,514, but was paid $260,000, evidencing a discrepancy that respondent could not account for at his deposition. Nevertheless, respondent asserts that "G.B. was provided with more money than she was entitled to receive" in that respondent "eventually paid for her additional expenses"; and he maintains that "[t]here was no venality on [his] part."
Respondent includes a September 15, 2024 affidavit from G.B., in which she praises respondent and attests that he provided badly needed financial assistance and kindness to her and her son during a period in which they were in dire straits. Because of this, G.B. got back on her feet and embarked upon a career as a registered nurse.
As to the V.R. matter, respondent states that he provided V.R. with financial assistance throughout her case, including sometimes paying her home health aides because she did not have the funds, and that he made no money from her case.
Respondent includes a September 2024 affidavit from the mother of his client Go.B. in which she attests that respondent represented her pro bono in a domestic relations matter; respondent has repeatedly provided financial assistance to her family; respondent settled Go.B.'s personal injury matter for $15,000 (and under the terms of the retainer agreement was entitled to a one-third contingency fee) of which he remitted $10,000 to her son, "plus significantly more [w]hile Go.B. was attending college"; and respondent "has only given and not taken" from her and her family.
Respondent also submits a September 2024 affidavit from his client C.G. who attests that respondent represented her in a divorce matter without charge; as to her personal injury matter, respondent was entitled to a $13,263.33 legal fee, she authorized him to deduct the approximate $3,760 fee she owed for the immigration matter from her recovery, and she received the sum of $22,762.67; and to this day respondent has not been fully compensated for the legal services he has provided to C.G. and her family.
In addition, respondent includes a September 2024 affidavit from his client P.B., to whom he provided financial assistance, including $18,500 in funeral expenses, which P.B. repaid.
Respondent states that he is "deeply sorry" that the Committee believes that he has failed to fully cooperate with the investigation but avers that he was preoccupied with attending [*7]to his mother which affected his ability to focus on the Committee's investigation. He attests that the documents provided to the Committee constituted his entire record-keeping of his escrow accounts.
As to the tax information sought by the Committee, respondent states that his accountant has advised him that he reported to the Internal Revenue Service that his taxes were not completed but that he has provided an estimate; and he "[is] not stalling the investigation but [is] asking for permission to complete [his] full tax returns and then provide those records to the [Committee]."
Respondent avers that none of his clients have been prejudiced by his actions in that "they were compensated above and beyond what they were entitled to receive"; and asks that the Court to not immediately suspend him from the practice of law.
22 NYCRR 1240.9(a) provides for an interim suspension:
"[U]pon a finding by the Court that the respondent has engaged in conduct immediately threatening the public interest. Such a finding may be based upon: (3) the respondent's failure to comply with a lawful demand of the of the Committee in an investigation under these Rules or (5) other uncontroverted evidence of professional misconduct."
The Committee has met its burden insofar as demonstrating that respondent has failed to fully cooperate with its investigation and should be suspended under 1240.9(a)(3) until further order of this Court. While respondent has produced some bookkeeping records, he has repeatedly failed to produce other "documentary corroboration, such as retainers, stipulations of settlement, final lien letters, litigation funding bills, and copies of checks," which the Committee has been requesting since January 2020, and which respondent is required to maintain under rule 1.15(d)(1).
While respondent asserts "that the documents provided to the Committee constituted [his] entire record-keeping of [his] escrow accounts," he repeatedly represented that he maintained at least some of the corroborating documentation sought by the Committee, including retainer and settlement agreements, but to date has not produced any of this material. Further, while respondent produced his tax returns to the Committee, he has not yet produced additional documentation and information related thereto that the Committee has been requesting since October 2023.
Based on the foregoing, respondent's interim suspension under 22 NYCRR 1240.9(a)(3) for noncooperation is warranted (see Matter of Fox, 197 AD3d 36 [1st Dept 2021]; Matter of Miller, 170 AD3d 1 [1st Dept 2019]; Matter of Moreno, 149 AD3d 65 [1st Dept 2017]; Matter of Evans, 142 AD3d 122 [1st Dept 2016]; Matter of Reid, 137 AD3d 25 [1st Dept 2016]).
The record does not support respondent's interim suspension under 22 NYCRR 1240.9(a)(5) however. While respondent was clearly deficient in his bookkeeping practices, and as a result apparently over disbursed his clients' recoveries, invaded lien funds, and overpaid [*8]himself by at least $112,000 in the G.B. matter (and possibly others), this evinces nonvenal misappropriation, as opposed to intentional conversion. Moreover, in their respective affidavits, neither G.B. nor C.G. allege that they received less than what they were entitled to from respondent, nor does the record evince such an allegation by any other client or party.
While negligent, nonvenal misappropriation is sufficient for the Committee to bring formal charges against respondent under 22 NYCRR 1240.8, it does not rise to the level warranting his interim suspension, nor does respondent's possible commingling of client and personal funds in his escrow account and financial assistance to non-pro bono clients (Matter of Spinnell, September 27, 2017 unpub order [M-2272] [interim suspension motion denied where the record evidenced nonvenal misappropriation of escrow funds due to deficient bookkeeping]). Committee later brought formal charges based thereon and attorney was suspended for one year (Matter of Spinnell, 185 AD3d 1 [1st Dept 2020], lv denied 36 NY3d 909 [2021]; see also Matter of Salo, May 4, 2007 unpub order [M-3234] [interim suspension motion denied where record evidenced unintentional misappropriation of lien funds, commingling, and deficient bookkeeping; formal charges later filed and attorney suspended for one year for nonvenal misappropriation of lien funds]; (Matter of Salo, 77 AD3d 30 [1st Dept 2010]).
Accordingly, the Committee's motion should be granted to the extent of suspending respondent from the practice of law on the grounds of noncooperation, in accordance with 22 NYCRR 1240.9(a)(3), effective immediately, and until further order of this Court.
All concur.
Wherefore, it is Ordered that the motion by the Attorney Grievance Committee for the First Judicial Department for immediate suspension, pursuant to 22 NYCRR 1240.9(a)(3), is granted, and respondent, Richard John Wright, is suspended from the practice of law in the State of New York effective immediately, and until further order of this Court; and
It is further Ordered that pursuant to Judiciary Law § 90, during the period of suspension, respondent Richard John Wright, is commanded to desist and refrain from (1) the practice of law in any form, either as principal or agent, clerk or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and
It is further Ordered that, during the period of suspension, respondent Richard John Wright, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15), which are made part hereof; and
It is further Ordered that if respondent, Richard John Wright, has been issued a secure pass by the Office of Court Administration, [*9]it shall be returned forthwith, and
It is further Ordered that, within 20 days of the date of service of this order, respondent Richard John Wright, may submit a request, in writing, to this Court for a post-suspension hearing (see 22 NYCRR 1240.9[c]).
Entered: February 4, 2025